IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PPC BROADBAND, INC., d/b/a
PPC,

               Plaintiff,            Civil Action No.
                                         5:13-CV-0538 (GLS/DEP)

     v.

CORNING OPTICAL
COMMUNICATIONS RF, LLC,

               Defendant.

_____

APPEARANCES:               OF COUNSEL:

FOR PLAINTIFF:

HISCOCK & BARCLAY, LLP      DOUGLAS J. NASH, ESQ.
One Park Place                JOHN D. COOK, ESQ.
300 South State St.           JASON C. HALPIN, ESQ.
Syracuse, NY 13202

FOR DEFENDANT:

DLA PIPER LLP (US)           JOSEPH P. LAVELLE, ESQ.
500 Eighth Avenue NW       ANDREW N. STEIN, ESQ.
Washington, DC 22004

HARTER, SECREST & EMERY LLP  DAVID M. LASCELL, ESQ.
1600 Bausch & Lomb Place     JERAULD E. BRYDGES, ESQ.
Rochester, NY 14604

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a patent infringement action involving two familiar foes directly competing in the cable connector industry. The patent in suit involves a compression-type cable connector designed to be universal and provide a water-tight seal when connected to the end of a cable for use in connecting to a television or other electronic device. The parties, plaintiff PPC Broadband, Inc. ("PPC"), and defendant Corning Optical Communications RF, LLC ("Corning Optical"), are engaged in other pending litigation in this district related to the family of patents in which the patent in suit is a member.[1]

The parties now seek guidance with respect to eleven claim terms appearing in the relevant patent, although only ten are seriously contested.[2] While certain of the terms in dispute have previously been construed by the court in the other pending lawsuits involving PPC and Corning Optical, the parties now request further refinement with respect to this action. The parties' disagreements regarding the terms in dispute

---

[1]     During the claim construction hearing held before the court on May 20, 2014, Corning Optical advised that it had changed its name from Corning Gilbert, Inc. The parties thereafter executed and submitted a stipulation on June 27, 2014, amending the caption of the case to reflect that change. Dkt. No. 33.

[2]     Under this court's local patent rules, the maximum number of claim terms which may be presented to the court for construction is ten, absent express relief from that limitation. N.D.N.Y. L. Pat. R. 4.4(b).

require the court to examine its obligation to resolve disputes that have crystallized based on their litigation positions advanced in the other pending lawsuits. The current claim construction dispute also asks the court to undertake a validity analysis concerning one claim, which, under the circumstances, I find appropriate.

This matter has been referred to me by Chief Judge Gary L. Sharpe, the assigned district judge, for the issuance of a report and recommendation concerning claim construction. The following constitutes my findings and recommendations based upon the submissions from the parties and a claim construction hearing conducted by the court.

I.     BACKGROUND

Plaintiff's complaint in this action asserts infringement of United States Patent No. 6,676,446 (the "'446 Patent"), issued on January 13, 2004, to inventor Noah P. Montena, an engineer employed PPC. Dkt. Nos. 1, 1-1. The '446 Patent is a member of a family of related patents that includes U.S. Patent No. 6,558,194 (the "'194 Patent"), issued on May 6, 2003, and the U.S. Patent No. 6,848,940 (the "'940 Patent), issued on February 1, 2005, both of which are the subject of another lawsuit between the parties currently pending in this court, *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 11-CV-0761 (N.D.N.Y. filed

July 4, 2011) ("*PPC I*").

The '446 Patent is entitled "Connector and Method of Operation," and relates to connectors used to couple cables to ports and terminals located on devices such as televisions. '446 Patent, 1:18-23. The technology disclosed in the '446 Patent, and the coaxial cable industry generally, is not particularly complex. A conventional coaxial cable provides a means for transmission of electronic signals and is typically comprised of four elements, including (1) an outer coating, to act as an environmental seal; (2) a metal braid, or shield, designed to prevent unwanted external magnetic signals and other influences from interfering with the electrical signals being conveyed by the cable; (3) a dielectric layer, which acts as an insulator; and (4) a center conductor through which the electrical signals travel. Dkt. No. 23-1 at 2; *see also* '446 Patent, 1:24-31. A coaxial cable connector, the device disclosed and claimed in the patent in suit, is typically attached to the end of a length of a coaxial cable to extend the physical and electromagnetic shielding structure of the cable through to the receiving port of the television or other device to which the cable is being attached. Dkt. No. 23-1 at 2. The connector typically facilitates attachment to the port through use of a threaded nut, or by other similar means. *Id.*

According to PPC, prior to its invention of the connector disclosed in the '446 Patent, early cable connectors employed a crimping process to join the connector and cable, usually through use of a hexagonal crimping tool that permanently deformed the connector, causing it to become affixed to the cable. Dkt. No. 23-1 at 2. This type of connector did not, however, provide a fully enclosed, impregnable seal between connector and cable. *Id.* at 2-3.

In the mid-1990s compression-type connectors, or radial seal connectors, were introduced. Dkt. No. 23-1 at 3. Among the advantages of such compression-type connectors was that they provided for a water-tight, 360-degree seal. *Id.* There were disadvantages associated with early compression-type connectors, however, including their use of multiple components, which rendered them difficult to manipulate, and they often were not designed to fit onto cable ends of differing diameters. *Id.*

In 1997, while working in his capacity for PPC, Montena conceived of a new type of compression connector that was both universal and provided for the benefit of a water-tight seal. Dkt. No. 23-1 at 3. Montena's invention, which is disclosed and claimed in the '446 Patent, includes five principal elements, including (1) a tubular post; (2) a nut or other component for attaching a connector to a video port; (3) a connector body

5

that, on one end is attached to the tubular post, and on the other includes a cylindrical sleeve or other deformable portion; (4) a fastener member; and (5) a tapered wall or similar dimensioning within the fastener member that deforms the deformable end of the connector body inwardly against the jacket of the coaxial cable when the fastener member is slid axially over the connector body. *Id.* The deformation at the end of the connector body in this manner serves to create a mechanical engagement with the cable and forms a water-tight seal. '446 Patent, 7:12-17.

An example of Montena's invention disclosed in the '446 Patent is set forth in the drawing below, which depicts a longitudinal, cross-sectional view of the preferred embodiment.



*Fig. 1*

'446 Patent, Fig. 1. The figure shows a connector **10** ready for placement on the prepared end of a cable **12**. '446 Patent, 6:28-30. The cable

includes an electrical center conductor **14** surrounded by a braid conductor or conductive grounding sheath **16**, a foil **18**, and an insulator core or dielectric **20**. *Id.* at 6:30-35. A dielectric covering or sheathing jacket **22** surrounds the braid and comprises the outermost layer of the cable. *Id.* at 35-37.

Turning to the connector **10**, it is dimensioned to accommodate receipt of the prepared coaxial cable, and consists of a first body member that includes a connector body or cylindrical body member **24** and a post member **26**. '446 Patent 6:48-53. The connector **10** also has a second body member, or a fastener member **28**. *Id.* at 6:53-55. The post member **26** typically is a tubular member having a first opening at the first end (toward the cable **12**) and a second opening at the second end (toward the nut member **44**). *Id.* at 6:55-57. The post member **26** defines the first inner cavity **34**. *Id.* at 6:57-58. The first outer cavity, or first central bore **36**, is open at the first end of the connector body **24** and is closed at the second end of the connector body **24** together with the post member **26**. *Id.* at 6:61-65.

The manner in which the connector disclosed in the '446 Patent operates is depicted in Figure 14, set forth below.



*Fig. 14*

Figure 14, which depicts one alternative embodiment of the connector disclosed in the '446 Patent, illustrates the manner in which the fastener member **228** compresses the connector **224** body radially inward when it is in this second, final configuration. '446 Patent, 12:54 – 13:30.

In the preferred embodiment, referring to Figure 1, the connector body **24** and the post member **26** are typically separate components, with the connector body **24** being press-fitted onto the outer surface of the post member **26**. '446 Patent, 6:66 – 7:1. The connector body **24** is preferably formed of brass or a copper alloy, and the post member **26** is composed of brass. *Id.* at 7:1-4. In an alternative preferred embodiment, the connector body **24** and post member **26** can be formed integrally as a single piece,

8

and the connector body **24** can be fabricated of a plastic composition. *Id.* at 7:4-7.

The focus of plaintiff's infringement claims in this action are two connector product lines offered by Corning Optical, including the UltraRange connector, which was developed in or about 2004, and the UltraShield, which was introduced in or about 2010 and operates much in the same way as the UltraRange connector in terms of the manner in which it forms a seal with a cable end. Dkt. No. 1 at 3-4; Dkt. No. 24 at 9-10. The UltraRange and UltraShield connectors differ from PPC connectors manufactured under the '446 Patent in the manner in which a water-tight seal is accomplished between connector and cable. Dkt. No. 24 at 10. Unlike the PPC connector, the UltraRange and UltraShield products do not include bodies that deform. *Id.* Instead, a plastic gripper is positioned to slide under the connector body and secure the cable, forming a seal between the connector and the inserted cable end. *Id.*

## II.   PROCEDURAL HISTORY

PPC commenced this action on May 8, 2013. Dkt. No. 1. PPC claims that defendant's accused products infringe claims 1, 2, 3, and 7 of the '446 Patent. Dkt. No. 23 at 11. Following the denial of a pre-answer motion to dismiss, Dkt. No. 20, Corning Optical filed an answer on December 6,

2013, generally denying the material allegations set forth in plaintiff's complaint, and, *inter alia*, asserting defenses and counterclaims, including non-infringement, invalidity, and unenforceability of the '446 Patent. Dkt. No. 21.

In anticipation of adjudication of the various claims and defenses raised in the action, the parties have requested the court's guidance in defining the following ten disputed terms within the '446 Patent: (1) "connector body/connector body member," (2) "a first central bore," (3) "central passageway," (4) "secured to the connector body prior to installation," (5) "central passageway being dimensioned," (6) "fastener member," (7) "dimensioned as a ramped surface," (8) "wherein the fastener member is slidingly moved . . . without rotation," (9) "a first end," and (10) "press-fit." Dkt. Nos. 19, 23, 24. Following the submission of extensive briefing and supporting materials regarding these claims terms, a claim construction hearing was held by the court on May 20, 2014. Text Minute Entry Dated May 20, 2014. At the conclusion of the hearing, I reserved decision. *Id.*

III.    <u>DISCUSSION</u>

A.    <u>Claim Construction Principles Generally</u>

Patent claim construction represents an issue of law to be decided by the court. *Aventis Pharma S.A. v. Hospira, Inc.,* 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. V. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*); *see also Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases."). "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." *Lighting Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014) (*en banc*).

As a general rule, a court tasked with construing a patent must assign claim terms their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the patent specification and prosecution history.[3] *Butamax(TM) Advanced*

---

[3]    The patent in suit's inventor, Montena, has opined that "a person of ordinary skill in the art of the '446 Patent in or before 1997 is a person who had a least a bachelor's degree in engineering and several years' experience in the cable and telecommunications industry relating to the design, manufacture, or utilization of coaxial cable connectors in communications systems." Dkt. No. 23-1 at 4. Corning

*Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1308-09 (Fed. Cir. 2014); *Thorner v. SONY Computer Entm't Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313; *accord, Thorner*, 669 F.3d 1365; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

There are two exceptions to this general rule. The first involves circumstances in which a patentee has acted as his own lexicographer, setting out a definition of a term that differs from its ordinary and customary meaning. *Butamax(TM)*, 746 F.3d at 1309; *Thorner*, 669 F.3d at 1365. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365 (quoting *CCS Fitness, Inc.*, 288 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. Under the

---

Optical has not offered a definition of a person of ordinary skill in the art as it relates to the '446 Patent.

second exception, a claim term may also properly be given a meaning that is different than its customary meaning "'when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Butamax(TM)*, 746 F.3d at 1309 (quoting *Thorner*, 669 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. These two exceptions to the rule that patent terms should be given their ordinary meaning are both narrow and exacting. *Thorner*, 669 F.3d at 1366-67.

While the words of a patent claim will generally control, they should not be interpreted in isolation. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In this respect, a patent specification, which some liken to an internal dictionary, must be carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* When resorting to a patent's specification for guidance with respect to disputed claim terms, a court must consider it as a whole, and where possible, all portions should be read in a manner that renders the patent

internally consistent. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Although the language of a patent specification can provide important clues regarding the proper construction to be accorded to a claim term, there are limitations upon its usefulness. "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment." *Cornell Univ. v. Hewlett-Packard Co.*, 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, J.) (citing, *inter alia*, *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the ordinary meaning of a claim term itself and the patent's specification, the prosecution history related to the patent in issue can help inform the proper construction of a claim term. *Phillips*, 415 F.3d at 1314. That history is generally comprised of "the complete record of proceedings before the Patent and Trademark Office [("PTO")], including any express representations made by the applicant regarding the intended

scope of the claims," and an examination of any relevant prior art. *Vitronics*, 90 F.3d at 1582-83. Such evidence, which typically chronicles the dialogue between the inventor and the PTO leading up to the issuance of a patent, and thus can act as a reliable indicator of any limitations or concessions on the part of the applicant, oftentimes proves highly instructive on the issue of claim construction. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").

B.      Construction of Disputed Terms

With the exception of "ramped surface" and "press fit," the disputed terms all appear in Claim 1 of the '446 Patent, the only independent claim contained within the patent. Claim 1, which serves as a useful backdrop for the following claim construction analysis, provides as follows:

> 1. A connector for coupling an end of a coaxial cable to a threaded port, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric being surrounded by a conductive metal braid, and the conductive metal braid being surrounded by a protective outer jacket, said connector comprising:

a.  a tubular post having a first end adapted to be inserted into an exposed end of the coaxial cable around the dielectric thereof and under the conductive metal braid thereof, said tubular post having an opposing second end;

b.  a connector body having a first end and a second end, the first end of said connector body having an outer wall and an inner wall, the second end of said connector body engaging said tubular post proximate the second end thereof, the inner wall bounding a first central bore extending about said tubular post for receiving the coaxial cable within the first central bore, said first end of said connector body member being deformable;

c.  a nut having a first end rotatably secured to at least one of the second end of said tubular post and the second end of the connector body, said nut having an opposing second end with an internally threaded bore for engaging the threaded port; and

d.  a fastener member having a first end and a second opposing end with a central passageway defined between the fastener member first end and the fastener member second end for allowing a portion of the coaxial cable to pass therethrough, the fastener member first end secured to the connector body prior to installation over the end of the coaxial cable in a pre-installed first configuration, the central passageway being dimensioned to compress the first end of the connector body radially inwardly to decrease the volume of the first central bore when the fastener member is slidingly moved from the first preinstalled configuration toward the second end of the connector body, wherein said fastener member causes said connector

body to be deformed inwardly toward said tubular post and against the protective outer jacket of the coaxial cable as said fastener member is advanced axially over the connector body toward the second end of said connector body.

'446 Patent 13:43-14: 1-31.

        1.    <u>Connector Body and/or Connector Body Member</u>

In *PPC I*, the court was confronted with a dispute regarding the proper construction of the terms "connector body" and/or "connector body member," as well as the closely aligned term "cylindrical body member," as they appeared in two other patents in the '446 Patent family. Corning Optical argued in that case that the connector body and connector body member must be comprised of a single, unitary piece. The court specifically rejected that proposed construction, as well as those offered by PPC, and concluded that the terms were readily understood by those of ordinary skill in the art and needed no further construction. *PPC I*, No. 11-CV-0761, Dkt. Nos. 59, 67.

The court was again called upon in *PPC Broadband Inc. v. Corning Gilbert, Inc.*, No. 12-CV-0911 (N.D.N.Y. filed June 5, 2012) ("*PPC II*") to construe the term "connector body" as it relates to two separate patents, United States Patent Nos. 8,192,237 (the "'237 Patent"), and 8,287,320 (the "'320 Patent") that also involve cable connectors but address the

"front end" of the connector and are designed to enhance continuity and provide a reliable ground path and electromagnetic shielding through the post component all the way to the receiving port. Based upon PPC's assertion in that case that Corning Optical had evidenced an intent to usurp the court's claim construction function in *PPC I* by arguing to the jury that the connector body must be a single, unitary piece, the court construed the term "connector body" to mean the "structure of the connector that is secured to the post at one end and includes an open end for receiving a portion of the coaxial cable. This structure can be comprised of more than one piece, and is therefore not limited to a single integral or unitary one-piece component." *PPC II*, No. 12-CV-0911, Dkt. Nos. 64, 103.

For purposes of this action, I recommend that the terms "connector body" and "connector body member" be construed in the same manner as the term "connector body" was in *PPC II*. This construction closely aligns with both Claim 1 of the '446 Patent, the patent's only independent claim, and the patent specification. Claim 1 describes the connector body as

> having a first end and a second end, the first end of said connector body having an outer wall and an inner wall, the second end of said connector bodying engaging said tubular post proximate the second end thereof, the inner wall bounding a first

central bore extending about said tubular post for receiving the coaxial cable within the first central bore, said first end of said connector body member being deformable.

'446 Patent 14:1-8. The specification explains, at various points, that the connector body is connected to the post member and has an open first end. *See, e.g., id.* at 3:8-11 ("The connector body is fastened to a portion of the post member adjacent the second opening of the post member and the opening of the connector body is adjacent to the first opening of the post member."); 6:61-65 ("The first outer cavity or first central bore **36** is open at the first end of the connector body **24** and is closed at the other end or second end of the connector body or cylindrical body member **24** together with the post member **26**."); 9:28-30 ("The inner surface of connector body **124** which is radially spaced from post member **126** to define a first outer cavity **138** at a first end accessible via opening **140**."); 11:34-36 ("The inner surface of the connector body cooperates in a radially spaced relationship with the post member to define a first outer cavity **238** accessible via opening **240**."). In addition, although the language of Claim 1 does not identify the specific composition of the connector body, the specification explains that the connector body and post member are preferably separate components. *Id.* at 6:66-67.

Armed with non-infringement contentions revealing that Corning Optical intends to advance additional arguments regarding this term to the jury, PPC now requests that the court's construction address several issues, including whether the pieces comprising the connector body must be made of the same material, whether the connector body can have any moving components, and whether any of them can slide. Dkt. No. 23 at 11. PPC requests the court to address those issues in anticipation of Corning Optical's argument that the gripper used in its connector, which slides, is not part of the connector body. *Id.* PPC proposes that the court construe the term at issue consistent with *PPC II*, and urges the court to issue the further instruction that the

> 'connector body member' or 'connector body' is **not** limited to a one-piece structure (*i.e.*, it can be comprised of more than one piece), is **not** limited to structure made of a single material, is **not** limited based on the naming convention used by Gilbert for its connector components, is **not** limited based on how the connector is assembled, and is **not** limited to structure that has pieces that never move relative to one another and never are inserted into one another.

Dkt. No. 23 at 11.[4]

---

[4]    In the parties' joint claim construction statement, PPC proposed that the court follow *PPC I* by not defining "connector body" and/or "connector body member" and simply instruct regarding the limitations on the connector body's composition. Dkt. No. 19-1 at 1. Since the submission of the joint claim construction statement, however,

Should Corning Optical attempt to elicit expert testimony at trial suggesting further refinement of the construction of "connector body" and/or "connector body member" beyond the court's construction, such as urging that a person of ordinary skill in the art would understand that, if the connector body was constructed of more than one piece, the two pieces would have to be comprised of the same material, such testimony would properly be precluded by the trial court. *CytoLogix Corp. v. Ventana Meds. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (finding the district court's admission of conflicting expert testimony at trial regarding claim construction improper). The expert testimony would go to directly to claim construction, a matter of law for the court, rather than infringement. As the Federal Circuit has noted, "The risk of confusing the jury is high when experts opine on claim construction before the jury even when . . . the district court makes it clear to the jury that the district court's claim constructions control." *CytoLogix Corp.*, 424 F.3d at 1172 (footnote omitted). With those principles in mind, I decline PPC's invitation to issue a recommendation limiting the composition of the connector body because

PPC has altered its position and now requests the court construe the term consistently with *PPC II*, as well as to include the additional limitations on the connector body's composition. Dkt. No. 23 at 11.

there are legal safeguards in place to avoid the scenario envisioned by PPC.

Turning to Corning Optical's proposed construction, it argues that the connector body is limited to the portion of the connector surrounding the post member, or tubular post, and thus cannot extend beyond the end of the post. Dkt. No. 24 at 13-14. This proposed limitation finds no support from the intrinsic evidence. For example, the '446 Patent specification describes the embodiment reflected in Figure 1, shown above in Part I of this report, in relevant part, as follows:

> The connector **10** has a first body member that includes connector body or cylindrical body member **24** and post member **26**. The connector **10** also has a second body member which as shown in FIGS. 1-4 is fastener member **28**. The post **26** preferably is a tubular member having a first opening at a first end **30**, and a second opening at a second end **32**. The post or tubular post **26** defines a first inner cavity **34**. The inner surface of connector body **24** is radially spaced about the post **26** to define a first outer cavity **36** accessible via opening **38** at one end or a first end of the connector body **24**. The first outer cavity or first central bore **36** is open at the first end of the connector body **24** and is closed at the other end or second end of the connector body or cylindrical body member **24** together with post member **26**.
>
> Preferably, the connector body **24** and the post member **26** are separate components wherein the connector body **24** is press fitted onto the outer

surface of the post member **26**. In this preferred
embodiment, the connector body **24** is preferably
formed of brass or a copper alloy and the post
member is formed of brass. In an alternative
preferred embodiment, the connector body **24** and
post member **26** can be formed integrally as a
single piece. Also, the connector body **24** can be
formed of a plastic composition.

'446 Patent, 6:51-7:7. As can be seen from this excerpt, which is

representative of the patent in suit, the '446 Patent utilizes the terms

connector body and connector body member to denote a structure of the

connector that has an open end in which the coaxial cable is received and

is attached to a tubular post on the other end. Nothing in the specification

explicitly limits the connector body or connector body member to just the

portion that surrounds the tubular post to define a central bore. Likewise,

neither the claims nor the specification reveal a requirement either that the

connector body or connector body member extend all the way along the

first central bore or that it terminates where the post ends.

In support of its position with regard to this term, Corning Optical

cites the decision in *Corning Gilbert Inc. v. United States*, 896 F. Supp. 2d

1281 (Ct. of Int.'l Td. 2013). I do not read that decision as reaching a

materially different result or undercutting the construction I have

recommended. The court in that case rejected the government's proposal

that the term be defined to mean "'the generally cylindrical shaped portion of the connector that has a cylindrical sleeve on one end and that engages the tubular post on the other end,'" in favor of Corning Optical's suggestion that the term be construed as "'generally cylindrical shaped outer portion of the connector that surrounds the tubular post to define a central bore.'" *Corning Gilbert Inc.*, 896 F. Supp. 2d at 1292-94 (alteration omitted). The key focus of that court's decision was that the construction should reflect the intent of the inventors to the extent that the connector body and the post define a bore into which the cable can be received. *Id.* at 1293. This is entirely consistent with my recommended construction, although, admittedly, it is worded somewhat differently.

I therefore recommend adoption of the same construction as previously rendered in *PPC II*, construing "connector body/connector body member" to mean the "structure of the connector that is secure to the post at one end and includes an open end for receiving a portion of the coaxial cable. The structure can be comprised of more than one piece and is therefore not limited to a single integral or unitary one-piece component."

### 2. A First End

The parties next differ over the proper construction of the term "a first end." Dkt. No. 19-1 at 2. For its part, PPC urges the court to follow the recommendation and adopting decision in *PPC I*, and conclude that the term needs no further construction. *Id.* Corning Optical counters with the suggestion that "a first end" be construed to mean "[t]he open end of a connector body 24, shown on the right side of Figure 3 of the '446 Patent." *Id.*; *see also* Dkt. No. 24 at 20-21.

During the claim construction hearing, Corning Optical stated that, while it wished to preserve the issue for appeal, it would accept the court's earlier finding that no construction of this term is necessary. Accordingly, as I did in *PPC I*, I again recommend that the court refrain from providing further refinement with regard to this term.

### 3. A First Central Bore Extending About Said Tubular Post

The third claim term in dispute is "a first central bore extending about said tubular post." Dkt. No. 19-1 at 2. In keeping with the court's decision in *PPC I*, PPC proposes that the term be defined as "[a] cavity lying between the inner wall of the connector body and the post." *Id.*; *see also* Dkt. No. 23 at 21. Corning Gilbert counters by proposing a similar definition, "[a] cavity lying between the connector body and the tubular

25

post." Dkt. No. 19-1 at 2; *see also* Dkt. No. 24 at 22.

Claim 1 of the '446 Patent describes, *inter alia*,

> a connector body having a first end and a second
> end, the first end of said connector body having an
> outer wall and an inner wall, the second end of said
> connector body engaging said tubular post
> proximate the second end thereof, the inner wall
> bounding a first central bore extending about said
> tubular post for receiving the coaxial cable within
> the first central bore, said first end of said
> connector body member being deformable[.]

'446 Patent, 14:1-8. The manifest purpose of the first central bore formed

in the manner set forth above is to house a portion of the cable braiding

and cable jacket once the cable is inserted into the connector, permitting

the cable braid to make electrical contact with the a tubular post in order to

extend the braid's electromagnetic shield fully to the port to which the

connector is attached. *See, e.g.,* '446 Patent, 8:27-41.

In the end, there does not seem to be any material disagreement

between the parties concerning the fact that the first central bore

essentially represents a cavity lying between the inner wall of the

connector body and the outer portion of the tubular post. Accordingly, I see

no reason to deviate from the construction recommended and adopted in

*PPC I*, and therefore recommend that the term be construed to mean "a

cavity lying between the inner wall of the connector body and the post."

4.      Fastener Member

The parties next request construction of the term "fastener member."

Dkt. No. 19-1 at 4. PPC asks that the court adopt the same construction

reached in *PPC I*, defining the term to mean "[t]he structure of the

connector that deforms the connector body member inwardly toward the

post when slid over the connector body member." *Id.*; *see also* Dkt. No. 23

at 26. Corning Optical counters with a similar, but slightly different,

proposed construction, "[t]he structure of the connector that deforms the

connector body inwardly toward the post when slid over the connector

body." Dkt. No. 19-1 at 4; *see also* Dkt. No. 24 at 24-25.

The term in issue is contained within the patent's only independent

claim, Claim 1, and thus is incorporated into all of the claims, as follows:

> a fastener member having a first end and second
> opposing end with a central passageway defined
> between the fastener member first end and the
> fastener member second end for allowing a portion
> of the coaxial cable to pass therethrough, the
> fastener member first end secured to the connector
> body prior to installation over the end of the coaxial
> cable and in a pre-installed first configuration, the
> central passageway being dimensioned to
> compress the first end of the connector body
> radially inwardly to decrease the volume of the first
> central bore when the fastener member is slidingly
> moved from the first preinstalled configuration
> toward the second end of the connector body,
> wherein said fastener member causes said

> connector body to be deformed inwardly toward
> said tubular post and against the protective outer
> jacket of the coaxial cable as said fastener member
> is advanced axially over the connector body toward
> the second end of said connector body.

'446 Patent, 14:14-31.

The only significant difference between the constructions offered by the parties with respect to this term surrounds whether the fastener member is a structure that deforms the connector body member, as PPC argues, or instead the connector body, as proposed by Corning Optical. Dkt. No. 19-1 at 4. In *PPC I*, the term "fastener member," as it relates to the '940 Patent, was defined as "the structure of the connector that deforms the connector body member inwardly toward the post when slid over the connector body member." *See PPC I*, No. 11-CV-0761, Dkt. No. 59 at 38. As Corning Optical correctly notes, however, the '446 Patent overwhelmingly, including in Claim 1, utilizes the term "connector body" as opposed to "connector body member." *See, e.g.,* '446 Patent, 7:52-58; 8:15-26; 13:43-14:31. While this may be a distinction without a difference in light of the strong evidence suggesting that the '446 Patent inventor utilized the terms "connector body" and "connector body member" interchangeably, I agree with Corning Optical that, for purposes of this action, "connector body" should be used in construing the term "fastener

member." Accordingly, I recommend that the term "fastener member" be defined as "the structure of the connector that deforms the connector body inwardly toward the post when slid over the connector body."

### 5. Central Passageway

The parties' proposed constructions of the next term for construction, "central passageway," do not materially differ. PPC requests that the court affix the same construction as in *PPC I*, defining the term as "a cavity in the center of the fastener member extending between the first and second ends thereof." Dkt. No. 19-1 at 3; Dkt. No. 23 at 22. Corning Optical proposes a slightly different definition, arguing that the term should be construed as "a cavity in the connector defined by the inner portion of the fastener member and extending between the first and second ends of the fastener member." Dkt. No. 19-1 at 3; Dkt. No. 24 at 22.

Claim 1 of the '446 Patent discloses a fastener member with a central passageway

> dimensioned to compress the first end of the connector body radially inwardly to decrease the volume of the first central bore when the fastener member is slidingly moved from the first preinstalled configuration toward the second end of the connector body, wherein said fastener member causes said connector body to be deformed inwardly toward said tubular post and against the protective outer jacket of the coaxial cable as said

> fastener member is advanced axially over the
> connector body toward the second end of said
> connector body.

'446 Patent, 14:22-31. Claim 2 of the '446 Patent, which is dependent on

Claim 1, specifies that "the central passageway is dimensioned as a

ramped surface." *Id.* at 14:32-33. According to the '446 Patent

specification, the "[f]astener member **28** is shown in FIGS. 1 and 4 as

being preferably of a tubular configuration . . .[,]preferably formed of steel

with an electroless nickel/teflon finish, and has a first opening **56** at a first

end and a second opening **58**[ ]at a second end which define a second

cavity or a central passageway between first and second end of

compression ring **60**." *Id.* at 7:37-43.

During the claim construction hearing, while reserving its right to

appeal, Corning Optical accepted, for purposes of this action, the

construction from *PPC I.* I therefore recommend that the term "central

passageway" be defined to mean "a cavity in the center of the fastener

member extending between the first and second ends thereof."

6.     <u>Secured to the Connector Body Prior to Installation</u>

Claim 1 of the '446 Patent requires that the first end of the fastener

member be "secured to the connector body prior to installation over the

end of the coaxial cable in a pre-installed first configuration[.]" '446 Patent,

14:18-21. PPC argues that the first part of that phrase, "secured to the connector body prior to installation," should be construed to mean "[t]he first end of the fastener member is secured to the connector body before the prepared end of the coaxial cable is inserted into the second end of the fastener member during installation." Dkt. No. 19-1 at 3; Dkt. No. 23 at 23. Corning Optical proposes that the term be construed as "[t]he fastener member is secured to the connector body at some point prior to cable installation." Dkt. No. 19-1 at 3; Dkt. No. 24 at 25. Corning Optical contends that PPC's proposed construction improperly imports limitations not supported in the language of Claim 1. Dkt. No. 24 at 25-26; Dkt. No. 27 at 12-13. PPC, on the other hand, argues that Corning Optical's proposed construction imprecisely describes the point in time when the fastener member must be secured to the connector body. Dkt. No. 23 at 24; Dkt. No. 28 at 18-19.

Addressing Corning Optical's argument first, I agree that PPC's proposed construction improperly imports limitations from the specification that do not exist in the language of Claim 1. Although, as Corning Optical concedes, the specification supports PPC's proposed construction, I see no reason to import language from the specification into the construction of the term at issue because, as discussed more below, it is my view that

the real contention with respect to this term concerns the point in time at which the fastener member must be secured to the connector body. PPC's proposed construction unnecessarily includes descriptors that contribute nothing to that dispute. More specifically, there is no need to include in the construction of the term at issue that the fastener member is secured at its "first end," or that the "prepared end" of the coaxial cable is installed, or that the "prepared end" of the cable is inserted into the "second end" of the fastener member. Importing those phrases from the specification, while they may be accurate descriptions of the functionality of the patent, is improper, as they are unncessary.[5] *See Kapusta v.Gale Corp.*, 155 F. App'x 518, 521 (Fed. Cir. 2005) ("[C]ase law is well established that, while a specification should be used to interpret the meaning of a claim, it should not be used to import unnecessary limitations into the claims." (citing *Phillips*, 415 F.3d at 1323)).

    Turning now to PPC's contentions, I agree that Corning Optical's proposed construction is too ambiguous. One of the touted benefits of the

---

[5]     Corning Optical also objects to inclusion of the word "member" in conjunction with "connector body." Dkt. No. 24 at 25-26; Dkt. No. 27 at 12. As previously discussed, although it is clear that the inventor of the patent in suit used the terms "connector body" and "connector body member" interchangeably, because the specification uses the term "connector body" with more frequency than "connector body member," and because Claim 1 recites "connector body" rather than "connector body member," I agree with Corning Optical that the court should use "connector body" in construing the term at issue.

invention disclosed in the '446 Patent is eliminating the risk that connector

components would be misplaced or lost during installation, an issue that

was historically prevalent in the industry. *See, e.g.,* '446 Patent 1:54 –

2:12. This is illustrated in the following portion of the patent's specification:

> In a pre-installed first configuration as illustrated in
> FIG. 1, the fastener member **28** is fastened onto
> the connector body **24** such that the first bore **62** is
> securely attached to the connector body **24**, and
> such that the connector body **24** is gripped to affect
> a corresponding decrease in the volume of the first
> outer cavity **36**. Thus, the connector body **24** is
> pushed radially inwardly towards the outer surface
> of the post **26**. In this manner, the fastener member
> **28**, in its pre-installed first configuration, is securely
> fastened to the connector body **24** and is thus in an
> assembled state during storage, handling, and
> installation on a cable end. This eliminates any
> danger of the fastener member **28** being dropped
> or otherwise mishandled during handling and
> installation as is prevalent in known designs.

'446 Patent, 8:1-16. This excerpt suggests there is no specific point in time

at which the fastener member must be secured to the connector body,

except that it must be secured in the "pre-installed first configuration." *Id.*

at 8:1-16. The specification also provides that "the fastener member **28**

can be coupled to the connector body **24** such that [it] can be removed by

hand," suggesting that there may be a point in time where the fastener

member can be disengaged from the connector body. *Id.* at 7:52-54.

33

Returning, however, to the language of Claim 1, it mandates that the fastener member be secured to the connector body at least "prior to installation over the end of the coaxial cable in a pre-installed configuration." *Id.* at 8:19-21.

In light of the specification and relevant claim language, it is clear that the inventors contemplated the fastener member would be securely connected to the connector body in the pre-installed state. This, indeed, was one of the advantages cited in support of the '446 Patent application. It is equally clear that, for the invention to function, the fastener member must be secured to the connector body before the coaxial cable is inserted into fastener member. The patent does not, however, preclude separation of the two components in between those two stages. I therefore recommend that the term "secured to the connector body prior to installation" be construed to mean "the first end of the fastener member is secured to the connector body in the pre-installed state and prior to the prepared end of the coaxial cable being inserted into the second end of the fastener member during installation."

7. <u>Central Passageway Being Dimensioned to Compress the First End of the Connector Body Radially Inward to Decrease the Volume of the First Central Bore</u>

Pivotal to the invention disclosed in the '446 Patent is the compression created by the fastener member – also called the "compression ring" – upon the deformable end of the connector body, which causes the connector to securely grasp the coaxial cable and provide for an environmental seal that will eliminate, among other things, the possibility of moisture penetration. *See, e.g.,* '446 Patent, 7:12-17, 7:22-27. This is accomplished by advancing the fastener member, which is designed to accomplish the desired deformation, toward its first end over the connector body. *Id.* at 5:3-7, 14:24-31. The '446 Patent describes the deformation process as follows:

> [T]he central passageway being dimensioned to compress the first end of the connector body radially inward to decrease the volume of the first central bore when the fastener member is slidingly moved from the first preinstalled configuration toward the second end of the connector body, wherein said fastener member causes said connector body to be deformed inwardly toward said tubular post and against a protective outer jacket of the coaxial cable as said fastener member is advanced axially over the connector body toward the second end of the said connector body.

'446 Patent 14:21-31.

The parties now disagree over the meaning of this term, and specifically how that deformation occurs. PPC urges that this term be construed to mean "[t]he compression of the first end of the connector body member reduces the size of the first central bore," while Corning Optical proposes "[t]he central passageway contains a portion of reduced diameter that contacts the connector body and compresses the body radially inwardly." Dkt. No. 19-1 at 4; *see also* Dkt. No. 23 at 24; Dkt. No. 24 at 23. At the claim construction hearing, PPC criticized Corning Optical's proposed construction because it appears to require compression radially inward, and does not admit of other types of dimensioning that would accomplish the same objective. Corning Optical, in turn, accused PPC's proposed construction of stating a functional result, rather than describing the structure of the central passageway.

In my view, PPC's proposed definition of this term ignores the claim language requiring the central passageway be dimensioned in a manner as to compress the first end of the connector body *radially* – also referred to as "concentrically" – inwardly. PPC's construction merely specifies that the compression accomplished by the first end of the connector body reduces the size of the central bore, without specifying the precise manner by which that occurs. PPC's construction risks effectively writing the term

"radially" out of the claim altogether.

Corning Optical's proposed definition, on the other hand, is supported by the specification and accurately reflects the manner in which the end of the connector body becomes compressed. For example, the specification explains that "[t]he fastener member or compression ring **28** includes a first inner bore or first end **62** having a first diameter, and a second inner bore or second end **64** having a second or reduced diameter which is less than the diameter of the first bore." '446 Patent, 7:43-47. It further explains that "[t]he second inner bore [of the fastener member] **154** is dimensioned to compress the connector body radially inwardly when the fastener member is in its second configuration." *Id.* at 10:25-27; *see also id.* at 11:5-8, 13:13-17.

Accordingly, I recommend that the court adopt Corning Optical's proposed construction of the term "central passageway being dimensioned to compress the first end of the connector body radially inwardly to decrease the volume of the first central bore," with one addition. The proposed construction by Corning Optical does not account for the phrase "to decrease the volume of the first central bore" contained in the term at issue. In my view, that phrase constitutes the entire purpose of the compression of the connector body. Stated differently, the central

passageway's construction, including a portion with a reduced diameter, is designed to compress the connector body so that size of the central bore may decrease. Without the reduction in the central bore's size, the outer portion of the coaxial cable will not be properly gripped by the post member. For these reasons, I recommend the term at issue be construed to mean "the central passageway contains a portion of reduced diameter that contacts the connector body and compresses the body radially inward toward the post, thereby decreasing the volume of the first central bore."

### 8. Ramped Surface

Claim 2 of the '446 Patent, which is dependent on Claim 1, requires that the central passageway of the connector be dimensioned "as a ramped surface." '446 Patent, 14:32-33. Although Corning Optical argues that this term requires no construction, PPC proposes that the term be defined as "[a] surface inside the fastener member that starts at one diameter and narrows to a smaller diameter." Dkt. No. 19-1 at 5; *see also* Dkt. No. 23 at 26; Dkt. No. 24 at 24.

The ramping of a surface is a concept that, I suspect, would be well-known to a person of ordinary skill in the art when read in the context of

the patent specification.[6] Dependent Claim 2 requires that the deformation of the connector body be accomplished by a fastener member with a central passageway dimensioned as a ramped surface. *See, e.g.,* '446 Patent, 10:25-27; *see also id.* at 11:5-8, 13:13-17. Figure 17 of the '446 Patent, set forth below, illustrates the ramped surface of the fastener member.



*Fig. 17*

The specification describes this embodiment, in pertinent part, as follows:

> Referring to FIG. **17**, similar to the fastener
> members shown in FIGS. 4 and 10, fastener
> member or compression ring **228** . . . includes a first
> inner bore **256** having a first constant diameter or

6     The noun "ramp," of course, carries different definitions. As the word is used in the '446 Patent, however, dictionaries have defined it as "[a]n inclined plane connecting two different levels; a slope." *See ramp, n.*, Oxford English Dictionary, http://www.oed.com/view/Entry/157859?rskey=xcJeDf&result=5&isAdvanced=false#eid (last visited Sept. 18, 2014).; *see also The Am. Heritage Dictionary of the English Language* 1447 (Joseph P. Pickette, *et al.* eds.) 4th ed. 2000 ("an inclined surface or roadway connecting different levels").

untapered diameter and a second inner bore **258** having a second diameter which is less than the diameter of the first bore. A ramped surface **260** is provided between the first and second bores, the ramped surface leading from the first opening **262** and narrowing to a reduced diameter at a second opening **264** as compared with the first diameter.

*Id.* at 11:66 – 12:11. Elsewhere, the specification alternatively identifies the "ramped surface" as an "inwardly tapered annual wall." *Id.* at 7:48.

In light of these descriptions, I conclude that PPC's proposed construction, with slight modification including to specify the direction of tapering, is consistent with the patent's specification. I therefore recommend that "ramped surface" be construed to mean "a surface inside the fastener member that starts at one diameter toward the first opening and gradually narrows to a smaller diameter toward the second opening."

> 9. Wherein the Fastener Member Is Slidingly Moved From the First Pre-Installed Configuration to the Second

Claim 3 of the '446 Patent specifies the connector of Claim 1 "wherein the fastener member is slidingly moved from the first pre-installed configuration toward the second end of the connector body without rotation." '446 Patent, 14:34-37. PPC contends that this claim term should be construed to mean "the fastener member is configured to slide from its first pre-installed position toward the second end of the connector body

without having to be rotated." Dkt. No. 19-1 at 5; Dkt. No. 23 at 28.

Corning Optical argues that "without rotation" constitutes a method step

that is inappropriately contained within Claim 3, an apparatus claim. Dkt.

No. 19-1 at 5; *see also* Dkt. No. 24 at 26 (citing *IPXL Holdings, L.L.C. v.*

*Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)).[7] In the event the court

does not agree, Corning Optical alternatively requests that the term be

construed to mean "[t]he fastener member is configured to slide only

axially from its pre-installed position toward the second end of the

connector body without the ability to rotate while being slid." Dkt. No. 19-1

at 5.

Corning Optical's contention that Claim 3 impermissibly represents a

hybrid apparatus and method claim asks the court to make a

determination regarding patent validity, rather than claim construction. The

---

[7]     In *IPXL Holdings*, in a matter of first impression, the Federal Circuit concluded
that a patent claim that recites both an apparatus and a method of using the apparatus
is impermissibly indefinite under 35 U.S.C. § 112, ¶ 2. *IBXL Holdings*, 430 F.3d at
1384. Relying on the rationale set forth by the Board of Patent Appeals and
Interferences of the PTO, the court explained that,

> as a result of the combination of two separate statutory
> classes of invention, a manufacturer or seller of the claimed
> apparatus would not know from the claim whether it might
> also be liable for contributory infringement because a buyer
> or user of the apparatus later performs the claimed method
> of using the apparatus.

*Id.* The confusion existing under these circumstances renders the claim insufficiently
precise under section 112, paragraph 2. *Id.*

41

Federal Circuit has held that "an analysis under [35 U.S.C.] § 112, ¶ 2 is inextricably intertwined with claim construction," *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999). Accordingly, the court may address arguments regarding the alleged indefiniteness of a claim at the claim construction stage. *See Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 701 (Fed. Cir. 1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."); *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993) ("[W]hile the parties in the midst of a dispute have disagreed concerning the meaning of the claims, the claims are not so lacking in clarity as to be invalid [as indefinite]."). In response to Corning Optical's arguments, PPC maintains that Claim 3 permissibly builds upon Claim 1 by limiting the connector described in Claim 1 to one that is configured to slide without rotation. Dkt. No. 28 at 24 (citing, *inter alia*, *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 903 (Fed. Cir. 2013)). Corning Optical is correct that Claim 3 is an apparatus claim. See, *e.g., In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) (explaining there is a "distinction between a claim to a product, device, or apparatus, all of which are tangible items, and a claim to a process [or method], which

consists of a series of acts or steps"); *Hewlett-Packard v. Bausch* & *Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("[A]pparatus claims cover what a device *is,* not what a device *does."* (emphasis in original)). Its conclusion that the phrase "without rotation" is a method step, however, is misguided. There is nothing in Claim 3 or anything in the '446 Patent's specification suggesting that someone is required to slide the fastener member toward the connector body (with or without rotation). Instead, Claim 3 further defines the connector, the device disclosed in the patent, by describing that the fastener member is slid out of its "preinstalled configuration toward the second end of the connector body" without being rotated. Unlike in *IPXL Holdings,* it is clear that infringement of Claim 3 occurs when an individual creates a connector, as described in Claim 1, that includes a fastener member capable of being moved from its preinstalled configuration towards the connector body without being rotated.  Nothing in the language of Claim 3, however, suggests that an individual would infringe upon the patent by sliding the fastener member toward the connector without rotating it. Accordingly, I recommend the court reject Corning Optical's contention that this claim term is invalid due to indefiniteness.

Turning to the matter of construction, the term in question appears to

be fairly simple and understandable, including to one of ordinary skill in the art. The connector specified in Claim 3 must be configured in such a way that the fastener member is permitted to slide from its first pre-installed position toward the second end of the connector body without being rotated. The claim does not provide, as Corning Optical suggests, that the fastener member is unable to mechanically rotate when sliding toward the connector body, and there is nothing in the specification to support that conclusion. I therefore recommend that Corning Optical's proposed construction be rejected, and that the claim term at issue be construed to mean that "the fastener member is configured to slide from its first pre-installed position toward the second end of the connector body without having to be rotated."

### 10.  First End of Said Connector Body Is Secured to Said Fastener Member by a Press Fit

The last claim term in dispute is "first end of said connector body is secured to said fastener member by a press fit." Dkt. No. 19-1 at 5. PPC argues that, because the meaning of this term would be evident to one of ordinary skill in the art, no construction is required. *Id.*; Dkt. No. 28 at 27. Corning Optical counters by requesting that the phrase be construed to mean "the first end of the connector body is secured to the fastener

member with frictional forces." Dkt. No. 19-1 at 5; Dkt. No. 24 at 21.

In my view, Corning Optical incorrectly contends that the patent specification "distinguishes between a 'press-fit' and an 'interference fit.'"[8] Dkt. No. 28 at 21. The term "interference fit" appears only once in the specification, and the context in which it appears suggests that it is intended to be synonymous with "press fit." More specifically, the specification provides that, "[a]s illustrated in FIGS. 7-8, post member **126** can also include a protrusion **142** on its outer annular surface for engaging the connector body **124**, which is otherwise attached to the post member by an interference fit, to insure a secured attachment with the connector body **124**." '446 Patent, 9:33-38. Aside from this sentence, the fastener member is described in the specification only as "press-fitted" to the connector body. *Id.* at 6:66 – 7:1; 7:59; 10:16-20; 12:25-29; 14:49-51. Accordingly, at the point in the specification where it describes the connector body is "otherwise attached to the post member by an interference fit," it is referencing a "press fit" because "press fit" is the only other means of attachment disclosed in the patent. *See Budde*, 250 F.3d at 1379-80 ("In construing terms used in patent claims, it is necessary to

---

[8]     Indeed, the source cited by Corning Optical for its proposition that "those skilled in the art recognize the terms 'press fit' and 'frictional fit' as synonymous" also suggests that the term "interference fit" is synonymous with those first two terms. A. Lebeck, *Principles and Design of Mechanical Face Seals*, Wiley-Interscience, 232 (1991).

consider the specification as a whole, and to read all portions of the description, if possible, in a manner that renders the patent internally consistent.").

Because I conclude there is no distinction between "press fit" and "interference fit," and because I agree that, when read in light of the specification, an ordinary person skilled in the art would understand what the term "press fit" means, I see no reason to construe that term.

IV.    SUMMARY AND RECOMMENDATION

The patent in suit involves a relatively simple structural design that is described in terms that, for the most part, are readily understandable. In some instances, the parties' proposed constructions of the disputed terms attempt to improperly import limitations not supported by the intrinsic evidence. It is also evident that the parties have taken advantage of the claim construction to argue the validity of certain claim terms.

Having carefully considered the patents in suit, the arguments of the parties, and the relevant and available intrinsic evidence, it is hereby respectfully recommended that the court affix the following meanings to the patent claim terms in dispute.

| Disputed Term | Proposed Construction |
|---|---|
| connector body and/or connector body member | structure of the connector that is secured to the post at one end and includes an open end for receiving a portion of the coaxial cable. The structure can be comprised of more than one piece and is therefore not limited to a single integral or unitary one-piece component. |
| a first end | no construction necessary |
| a first central bore extending about said tubular post | a cavity lying between the inner wall of the connector body and the post. |
| fastener member | the structure of the connector that deforms the connector body member inwardly toward the post when slid over the connector body. |
| central passageway | a cavity in the center of the fastener member extending between the first and second ends thereof. |
| secured to the connector body prior to installation | the first end of the fastener member is secured to the connector body in the pre-installed state and prior to the prepared end of the coaxial cable being inserted in to the second end of the fastener member during installation. |
| central passageway being dimensioned to compress the first end of the connector body radially inward to decrease the volume of the first central bore | the central passageway contains a portion of reduced diameter that contacts the connector body and compresses the body radially inwardly toward the post, thereby decreasing the volume of the first central bore. |
| ramped surface | a surface inside the fastener member that starts at one diameter toward the first opening and gradually narrows to a smaller diameter toward the second opening. |
| wherein the fastener member is slidingly moved from the first pre-installed configuration to the second | the fastener member is configured to slide from its first pre-installed position toward the second end of the connector body without having to be rotated |
| first end of said connector body is secured to said fastener member by a press fit | no construction necessary |

47

It is also hereby RECOMMENDED that the court reject Corning Optical's contention that the term "wherein the fastener member is slidingly moved from the first pre-installed configuration to the second end of the connector body without rotation" is invalid due to indefiniteness.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     September 18, 2014
           Syracuse, New York


David E. Peebles
U.S. Magistrate Judge